IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


BLOUNT INC., a Delaware corporation;              06-CV-767-BR
and OREGON CUTTING SYSTEMS, a division
of Blount Inc.,

        Plaintiffs,                              OPINION AND ORDER

v.

TRILINK SAW CHAIN, LLC, a Georgia
Limited Liability Company;
TRILINK GLOBAL, LLC, a Georgia Limited
Liability company;
JINHUA TRILINK HARDWARE COMPANY, LTD,
a Chinese company; and,
JINHUA HUIHUANG HARDWARE COMPANY, LTD,
a Chinese company,

        Defendants.


CHRISTOPHER J. LEWIS
DAVID W. AXELROD
Schwabe Williamson & Wyatt, P.C.
1211 S.W. Fifth Avenue
Portland, OR 97204
(503) 222-9981

    Attorneys for Plaintiffs

**SUSAN D. PITCHFORD**
**WILLIAM O. GENY**
Chernoff Vilhauer McClung & Stenzel, LLP
601 S.W. Second Avenue, Suite 1600
Portland, OR 97204
(503) 227-5631

    Attorneys for Defendants


**BROWN, Judge.**

    This matter comes before the Court for purposes of construction of certain claims in Plaintiffs' Patent No. 5,136,783 ('783 Patent) titled "Chain Saw Sprocket" and Patent No. 6,003,423 ('423 Patent) titled "Saw Chain Identification." The Court held a *Markman* hearing on April 13, 2007, and, thereafter, the parties filed a supplemental Joint Claim Construction Chart on April 27, 2007.


## THE PATENTS

    The '783 Patent provides in relevant part:

    1. *In a chain saw:*

    a guide bar having opposed guide edges and a
    nose sprocket;

    a saw chain having center links and side
    links with coupling pins pivotally connecting
    the center links front and rear to pairs of
    side links;

    said sprocket having sprocket teeth defining
    gullets therebetween, said guide edges of
    said guide bar having edge grooves, and tang
    portions provided on said center links of

said saw chain extending below said side
links and protruded into the edge grooves of
the guide bar and into the gullets of the
sprocket when the saw chain is entrained on
said guide bar, and as entrained on said
guide bar, said front and rear coupling pins
defining a common linear path along said
guide edges of said guide bar and a common
curviling around said nose sprocket;

said sprocket teeth having adjoining root
portions cooperatively configured to define
*a rounded bottom in said gullets;*

said center link *tang portions configured to
nest between the sprocket teeth* and further
configured with a *bottom tang portion mated
for engagement with the rounded bottoms in
said gullets* with the saw chain entrained on
the guide bar as defined above.

(disputed terms emphasized).

The '423 Patent provides in relevant part:

1. A saw chain comprising:

a series of multiple center links and side
links, said side links including tie straps
and cutter links, all arranged in a
repetitive sequence and pivotally
interconnected to form a loop of saw chain;

at least one link in the sequence of links
provided with *an identifying feature that
causes that link to visually stand out from
other links performing a similar function in
the saw chain, said feature provided such as
to enable that link to be identified by a
user regardless of wear to the saw chain;* and

said one link additionally provided with
printed information identifying the chain
characteristics for replacement purposes,
*which information is embedded into the
surface of the link* enabling a user to read
the information and from the information

3 - OPINION AND ORDER

enable the selection of a replacement saw
chain loop.

* * *

4.   A method of identifying characteristics
of a loop of saw chain to enable a user to
replace a used loop of saw chain with a
similar loop of saw chain, said method
implemented during production of the saw
chain loop, comprising:

selecting a specific link of a sequence of
links to be formed into a loop of saw chain;

providing *a replacement link that is
different in appearance from the appearance
of the selected link* and readily recognizable
by a user because of that difference;

*embedding the replacement link with printed
information*, providing a point of sales chart
containing the information and enabling the
user to select a similar replacement loop of
chain from among non-similar loops of chain;
and

*replacing said specific link in said sequence
of links with said replacement link* and
forming a loop of saw chain therefrom to
enable a user to readily identify the
information bearing replacement and thereby
readily discern the information needed for
replacement of the loop of saw chain.

(disputed terms emphasized).

In their Joint Stipulation following the *Markman* hearing,

Plaintiffs and Defendants agreed to the following claim

construction for certain disputed terms in the '423 Patent:

1.  In Claim 1 of the '423 Patent, the term "which

information is embedded into the surface of the link" means

"[t]he information is embedded on the surface of the link in a

4 - OPINION AND ORDER

manner that it won't wear away during the life of the loop, where said embedding may include but is not limited to stamping or engraving."

2.  In Claim 4 of the '423 Patent, the term "embedding the replacement link with printed information" means "[t]he information is embedded on the surface of the link in a manner that it won't wear away during the life of the loop, where said embedding may include but is not limited to stamping or engraving."

3.  In Claim 4 of the '423 Patent, the term "replacing said specific link in said sequence of links with said replacement link" means "[d]uring the production of the saw chain loop, replacing a specific link from the sequence of links with the replacement link."

The Court adopts these stipulated constructions.


## BACKGROUND

On May 31, 2006, Plaintiffs filed a Complaint alleging Defendant manufactures, imports, uses, sells, and/or offers to sell products that infringe the '783 Patent and the '423 Patent. As noted, the Court held a *Markman* hearing on April 13, 2007.


## STANDARDS

Federal Circuit precedent governs this matter. *See, e.g.,*

*Glaxo Group Ltd. v. Ranbaxy Pharm., Inc.*, 262 F.3d 1333, 1335 (Fed. Cir. 2001)("This court reviews claim construction without deference.").

To determine whether a defendant has infringed a patent is a two-step process:  (1) the court determines the meaning of a disputed claim and (2) a fact-finder compares the accused device to the claim as construed by the court to determine whether the patent is infringed.  *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 804 (Fed. Cir. 2007).  Claim construction is a matter of law for the trial court to decide.  *Clearstream Wastewater Sys., Inc. v. Hydroaction, Inc.*, 206 F.3d 1440, 1444 (Fed. Cir. 2000).

The terms of a patent claim generally are given the "ordinary and customary meaning" the terms would have had "to a person of ordinary skill in the art in question . . . as of the effective filing date of the patent application." *Phillips* v. *AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).  When interpreting the legally operative meaning of a disputed term, a court may consider "both intrinsic (*e.g.*, the patent specification and file history) and extrinsic evidence (*e.g.*, expert testimony)." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The court's inquiry, however, must begin with intrinsic evidence by looking "to the words of the claims themselves . . . to define the scope of the patented invention." *Acumed*, 483 F.3d

at 804 (citing *Phillips*, 415 F.3d at 1312).  The court also may look to intrinsic evidence in the specification, which is always "highly relevant" and often dispositive.  *See, e.g., Vitronics*, 90 F.3d at 1582.  *See also Phillips*, 415 F.3d at 1313 (a "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim . . . , but in the context of the entire patent, including the specification."). Finally, the court may look to the patent's prosecution history. *Vitronics*, 90 F.3d at 1582.

When analysis of the intrinsic evidence alone will resolve ambiguity in a disputed claim, "it is improper to rely on extrinsic evidence."  *Id.* at 1583.  If extrinsic evidence is needed, however, "it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence."  *Phillips*, 415 F.3d at 1319. Dictionaries, treatises, and expert testimony can be useful forms of extrinsic evidence.  *Id.* at 1318.

**DISCUSSION**

**'783 Patent**

The parties dispute the proper construction of the following four terms in Claim 1 of the '783 Patent:  (1) "In a chain saw"; (2) "a rounded bottom in said gullets"; (3) "tang portions configured to nest between the sprocket teeth"; and (4) "bottom

tang portion mated for engagement with the rounded bottoms in said gullets."

**I.    "In a chain saw"**

Claim 1 begins with the term "[i]n a chain saw."  Plaintiffs contend this preamble is not a claim limitation or an element of Claim 1, but merely describes a possible use for the invention. Defendants, however, maintain this term is a Jepson-type limitation and, therefore, is itself an element of Claim 1.

**A.    Jepson-type Preambles Generally.**

"Generally, the preamble does not limit the claims."  *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002).  In a Jepson-type claim, however, the preamble to the claim is a limitation on the scope of the claim.  *See Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 315 (Fed. Cir. 1985).  Jepson form allows an inventor to recite in a preamble "elements or steps of the claimed invention which are conventional or known."  *Kegel Co. v. AMF Bowing, Inc.*, 127 F.3d 1420, 1426 (Fed. Cir. 1997).  When this form is used, a "claim preamble defines not only the context of the claimed invention, but also its scope."  *Rowe v. Dror*, 112 F.3d 473, 479 (Fed. Cir. 1997).

There is no definitive "litmus test" to determine when a claim preamble is written in Jepson-type format.  *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808

(Fed. Cir. 2002).  A preamble, however, "does not limit the scope of the claim when it merely states a purpose or intended use of the invention."  *In re Paulsen*, 30 F.3d 1475, 1479 (Fed. Cir. 1994).  *See also Rowe*, 112 F.3d at 478 (when a "patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention, the preamble is not a claim limitation.").  Conversely, a preamble is limiting if it "breathes life and meaning into the claim".  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1118 (Fed. Cir. 2004).

In *General Electric Co. v. Nintendo Co. Ltd.*, the claim preamble referred to:  "A system for displaying a pattern on a raster scanned display device by mapping bits from a display location in a memory associated with a computer onto the raster."  179 F.3d 1350, 1361 (Fed. Cir. 1999).  The Federal Circuit held this preamble was a limitation that gave "life and meaning" to the claim because the preamble made clear that the inventors were attempting to solve a narrow problem pertaining to a particular raster scan display rather than attempting to improve all display systems generally.  *Id.* at 1361-62.

By contrast, the *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.* preamble described "A filter assembly for use with a bottle . . . to simultaneously cap the neck or open end *and* filter liquid poured out of the bottle. . . ."

381 F.3d at 1118 (emphasis in original).  The Federal Circuit found this preamble was not a claim limitation because it merely "recites a purpose or intended use of the claimed filter assembly."  *Id.*

Defendants assert the preamble to Claim 1 is a Jepson-type limitation because the specification of the '783 Patent provides the "invention relates generally to power equipment, and particularly to chain saws used for cutting material."  '783 Patent col.1 ll.6-8 (filed May 23, 1991).  *See also* 35 U.S.C. § 112 (the specification in general is a written description of the invention and the manner or process of making and using it).  Although Defendants maintain the specification clarifies that the '783 Patent requires a chain saw as an element of Claim 1, the text cited from the specification does not support Defendants' construction of the preamble.

If, as the specification states, the '783 Patent's invention relates specifically to a chain saw but also generally to power equipment, it is more likely that the preamble merely describes a purpose or intended use rather than laying out a claim limitation.  *See In re Paulsen*, 30 F.3d at 1479.  Thus, the specific case of a chain saw is only a subset of the general case of power equipment, and, therefore, the preamble is not a limitation.

As in *Innova/Pure Water*, and in contrast to *General Electric*

10 - OPINION AND ORDER

*Co.*, the preamble term "[i]n a chainsaw" does not indicate the '783 patentee was working on a narrow, specific problem. Moreover, the term does not appear to give "life and meaning" to the terms of Claim 1. Instead the preamble informs the reader of an intended use for the invention, and the language from the specification that Defendants highlight bolsters this interpretation.

The prosecution history of the '783 Patent also is instructive. At least two prior versions of the Claim 1 preamble were drafted and submitted to the Patent and Trademark Office. One version provided: "In a chain saw, a sprocket and saw chain combination comprising." Pitchford Decl., Ex. 1 at 40. Another version of the Claim 1 preamble provided: "In a chain saw including an elongated guide bar having a nose sprocket, a nose sprocket and saw chain combination comprising". Pitchford Decl., Ex. 1 at 55 (emphasis in original). Both of these prior versions of the Claim 1 preamble contain limiting and/or descriptive text that does not appear in the operative Claim 1 preamble, "[i]n a chain saw." Thus, the prosecution history demonstrates the '783 patentee ultimately chose a simplified preamble that merely describes a use for the patented invention. In other words, the patentee demonstrated the ability to write a limiting preamble that might have included elements of the claim, but ultimately the patentee chose not to do so.

Accordingly, in the context of the intrinsic evidence, the Court concludes the preamble to Claim 1 is not a Jepson-type limitation, but only describes an intended use for the invention.

## II.  "a rounded bottom in said gullets"

Claim 1 of the '783 Patent provides:

> said sprocket teeth having adjoining root
> portions cooperatively configured to define
> *a rounded bottom in said gullets* . . . .

(disputed term emphasized).

The parties agree the "sprocket" in question is a nose sprocket that has several teeth as described by the '783 Patent. Between these teeth is a space called a "gullet."  The parties also agree the disputed term "a rounded bottom in said gullets" refers to the bottom region that exists between adjacent sprocket teeth.  The only apparent difference between the competing constructions of the parties is the meaning of the term "rounded" when used to characterize the shape of the bottom of the gullet.

At the outset, the Court notes both parties have offered competing definitions from common English language dictionaries, particularly for the word "rounded."  As noted, however, the Court's task in claim construction must begin with intrinsic evidence.  If construction is resolved on that basis, the Court may not look to extrinsic evidence such as dictionary definitions.  *See Vitronics*, 90 F.3d at 1583.  In other words, the Court should not consider extrinsic evidence unless it cannot

12 - OPINION AND ORDER

resolve the matter with intrinsic evidence.

Defendants contend "a rounded bottom in said gullets" should be construed to mean "[t]he bottom region of the gullets between adjacent sprocket teeth has a radiused (semicircular) shape." Defendants note the '783 Patent refers to a sprocket design with a semicircular shape:

> According to a preferred embodiment of the invention, the drive tang is closely received within semi-circular nose sprocket gullet formations whereby operational forces imposed upon the nose sprocket arrive substantially as compressive forces, as opposed to the substantially tensile forces found in conventional chain saw design.

'783 Patent col.2 ll.15-24.

The Court notes this text is part of the '783 Patent's specification and is not necessarily binding on the claim itself. *See Phillips*, 415 F.3d 1315 (a patent claim is part of a "fully integrated written instrument, consisting principally of a specification that concludes with the claims.")(internal citations omitted). Moreover, this text merely describes the invention in its preferred embodiment. The Federal Circuit has frequently cautioned against impermissibly limiting a claim by importing specific features from a preferred embodiment into the claim. *See Acumed*, 483 F.3d at 805. *See also Phillips*, 415 F.3d at 1323 (even though "the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). Thus, this

13 - OPINION AND ORDER

reference to a semi-circular shape in the preferred embodiment is not dispositive.  In any event, the Federal Circuit also has warned that an illustrated embodiment, rather than limiting an invention, can indicate the patentee intends the illustration to be one embodiment but not necessarily the ideal embodiment of the invention.  *See Acumed*, 483 F.3d at 807.

Defendants also contend Figure 1 of the '783 Patent's illustrations shows gullet formations on a nose sprocket that are semicircular at bottom and formed to match the radius of corresponding tang portions on a saw chain.  In particular, Defendants rely on the following text from the specification:

> In the illustrated embodiment, the symmetry results from a similar radius of curvature for gullets 70 and tang portions 42 yielding a semicircular shape for each. Gullet formations 70 thereby possess the same symmetric relationship to the axis 72 when the corresponding tang formation 42 rests within the gullet formation 70.

'783 Patent col.4 ll.30-36.  This text constitutes a description of the illustrated embodiment of the '783 Patent.  Thus, it too is not dispositive.

Moreover, the language of the specification demonstrates Defendants' interpretation is too narrow.  The specification provides the gullet formations "closely receive the tang portions" of a saw chain, and "the tang portions 42 of center links 40 are substantially symmetric with respect to an axis 72 bisecting the center links 40 and the distance between rivets

14 - OPINION AND ORDER

44." '783 Patent col.4 ll.26-30.  The specification then
continues:  "In the illustrated embodiment, the symmetry results
from a similar radius of curvature for gullets 70 and tang
portions 42 yielding a semicircular shape for each."  '783 Patent
col.4 ll.30-33.  Although semicircular shape is one way that a
gullet portion can be configured to be "closely received" with a
saw-chain tang, it does not necessarily follow that Claim 1 of
Plaintiffs' '783 Patent requires a semicircular or radiused shape
in every case.  Adopting Defendants' construction would
impermissibly read into Claim 1 a limitation from the preferred
or illustrated embodiment.

     The final lines of the specification also demonstrate the
overbreadth of Defendants' construction:

          It will be appreciated that the present
          invention is not restricted to the particular
          embodiment or application that has been
          described and illustrated and that variations
          may be made therein without departing from the
          scope of the invention as found in the
          appended claims and equivalents thereof. . . .
          Furthermore, while the present invention has
          been shown and described with respect to a
          semi-circular drive tang portion, it will be
          understood that the present invention
          encompasses other drive tang and nose sprocket
          configurations wherein operational forces are
          desirably received substantially as
          compressive forces at the gullet formation of
          the nose sprocket.

'783 Patent col.5 ll.29-45.

     Here the patentee stressed a semicircular gullet formation
is not necessary to the invention.  The heart of the invention is

15 - OPINION AND ORDER

a drive tang and nose sprocket configuration in which operational forces are received as compressive forces in the gullet formation of the nose sprocket.  Such a configuration could embrace a semicircular/radiused gullet formation or merely a "curved" gullet formation properly configured to receive the described operational forces substantially as compressive forces.

Thus, Plaintiffs contend "a rounded bottom in said gullets" should be construed to mean "[a] curved bottom region between adjacent sprocket teeth."  The Court agrees.  This more generic description of the gullet bottom accords with the text of Claim 1 and the specification as discussed above.  Moreover, it does not read into Claim 1 the limitation of a specific geometric shape (*i.e.*, radiused or semicircular) when the intrinsic evidence demonstrates that such limitation is not required or intended. Interpreting this term to require no more than a "curved" gullet bottom encompasses not only the semicircular preferred embodiment but also other embodiments, which the patentee appears to have intended.  *See* '783 Patent col.5 ll.29-45.  *See also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope . . . .") (internal citations omitted).

16 - OPINION AND ORDER

Accordingly, the  "a rounded bottom in said gullets" is construed to mean "[a] curved bottom region between adjacent sprocket teeth."

### III. "configured to nest"

Claim 1 of the '783 Patent provides:

> said center link *tang portions configured to nest between the sprocket teeth* . . . .

The parties agree a "tang portion" consists of a portion of a saw-chain link that in some manner engages with a nose-sprocket gullet as the saw chain rotates.

Defendants contend "tang portions configured to nest between the sprocket teeth" should be construed to mean "[t]he tangs are symmetric with respect to an axis bisecting a line between the rivets on the center links and are shaped and sized to contact the entire radiused portion of the gullets."  As noted, however, the Court already has determined Claim 1 does not necessarily require a radiused shape for the gullet.

Moreover, Defendants' proposed construction would largely render redundant the next disputed term, "bottom tang portion mated for engagement with the rounded bottoms in said gullets." Here the disputed term refers to tang portions configured to nest between sprocket teeth.  In addition to seeking a construction of the relationship between the tang portions and the sprocket teeth, Defendants' construe the term to mean that the tang portions "are shaped and sized to contact the entire radiused

17 - OPINION AND ORDER

portion of the gullets."  The manner in which the tang portion
engages the gullet bottom is more directly addressed by the
fourth disputed term, however, which provides "bottom tang
portion mated for engagement with the rounded bottoms in said
gullets."

The Federal Circuit has cautioned against construing a claim
in a manner that renders another limitation meaningless or
superfluous.  For example, in *Primos, Inc. v. Hunter's
Specialties, Inc.*, the court held the terms "engaging" and
"sealing," both recited in a claim, could not mean the same thing
without impermissibly rendering one of the terms superfluous.
451 F.3d 841, 848 (Fed. Cir. 2006).  If the Court were to
construe the disputed term ("tang portions configured to nest
between the sprocket teeth") in a manner that included a
construction of how a tang bottom interacts with the rounded
bottom of a gullet, the Court could render the fourth disputed
term meaningless.  Thus, the Court concludes the proper
construction here should be limited to defining how the tang
portion must relate to the sprocket teeth.

Plaintiffs contend the term "tang portions configured to
nest between the sprocket teeth" should be construed to mean
"[t]he tangs are sized to be closely received such that they fit
between the sprocket teeth."  Again, this definition is more
faithful to the specification than Defendants' proposed

definition.   The specification describes prior technology as

follows:

> The drive tang engages the nose sprocket in
> wedge-like fashion, *i.e.* the tang contacts
> the sprocket at two points along the upper
> portion of the gullet, *i.e.,* at the sides of
> the adjacent sprocket teeth.

'783 Patent col.1 ll.47-51.  This "wedge-like" contact can cause

fatigue at the bottom of a gullet formation and result in

cracking.  '783 Patent col.5 ll.3-6.  The '783 Patent, however,

is designed so that the nose sprocket

> receives the drive tang portion of the saw
> chain substantially along the entire semi-
> circular gullet formation 70 resulting in
> substantially compressive forces applied to
> the sprocket 47.  Similarly, tangential
> forces, such as force vectors 62 illustrated
> in FIG. 1, result in tensile forces upon the
> conventional sprocket 80.  In contrast, the
> close nesting of the drive tang portions 42
> within the gullet formation 70 of the nose
> sprocket assembly 16 substantially reduces
> the effect of tangential force vectors by
> delivering such tangential force primarily as
> compressive forces.

'783 Patent col.5 ll.8-19.  Thus, rather than the drive tang

contacting the gullet in a wedge-like manner, the nose sprocket

closely receives the drive tang "substantially along the entire

semi-circular gullet formation" to produce compressive force on

the sprocket.  Accordingly, "nesting" is intended to distinguish

a mere two-point, wedging contact in which the sprocket teeth are

driven apart in favor of a close receiving of the drive tang and

resulting compressive forces toward the bottom of the gullet.

19 - OPINION AND ORDER

For these reasons, the term "tang portions configured to nest between the sprocket teeth" is construed to mean "[t]he tangs are sized to be closely received such that they fit between the sprocket teeth."

**IV.   "mated for engagement"**

Claim 1 of the '783 Patent provides:

> said center link tang portions configured to nest between the sprocket teeth and further configured with a *bottom tang portion mated for engagement with the rounded bottoms in said gullets* . . . .

(disputed term emphasized).

Defendants contend "bottom tang portion mated for engagement with the rounded bottoms in said gullets" should be construed to mean "[t]he tang portion contacts the rounded bottom of the gullets over the entire radiused portion when the chain is entrained on the nose sprocket." As noted, the Court has found a radiused shape is not required by Claim 1 of the '783 Patent.

Defendants' proposed construction is not permissible because it is more limited than the specification. The specification provides the nose sprocket "receives the drive tang portion of the saw chain substantially along the entire semi-circular gullet formation." '783 Patent col.5 ll.8-10. The word "substantially" demonstrates the patentee did not intend to limit the invention by requiring that the gullet formation contact the entire rounded bottom portion of the tang as Defendants contend.

Plaintiffs contend "bottom tang portion mated for engagement with the rounded bottoms in said gullets" should be construed to mean "[t]he tang portion is adapted to transmit operational forces to the bottom of the gullet." Here, however, Plaintiffs' definition is not specific enough. As noted, the specification provides the nose sprocket "receives the drive tang portion of the saw chain substantially along the entire semi-circular gullet formation." '783 Patent col.5 ll.8-10. This receiving means the drive tang contacts the gullet formation in a substantial manner. Plaintiffs' proposed definition is too broad, however, because it might encompass some manner of adaptation that results in the transmission of operational forces to the bottom of the gullet in some way other than by substantial contact between the gullet bottom and the tang portion.

On this record, the Court construes the term "bottom tang portion mated for engagement with the rounded bottoms in said gullets" to mean that "the tang portion is adapted to contact the gullet formation substantially along the rounded bottom region of the gullet to transmit operational forces to the bottom of the gullet."

This construction is faithful to the text and construction of Claim 1 and is not subject to the over- or under-inclusiveness of the parties' respective definitions.

21 - OPINION AND ORDER

**'423 Patent**

As noted, the parties stipulated to the construction of
three terms in the '423 Patent, and the Court has adopted those
constructions.  The parties dispute the proper construction of
two other terms:  (1) "an identifying feature that causes that
link to visually stand out from other links performing a similar
function in the saw chain, said feature provided such as to
enable that link to be identified by a user regardless of wear to
the saw chain" and (2) "a replacement link that is different in
appearance from the appearance of the selected link."

**I.    Claim 1:  "an identifying feature"**

Claim 1 of the '423 Patent provides:

> A saw chain comprising:
>
> . . . . at least one link in the sequence of
> links provided with *an identifying feature*
> *that causes that link to visually stand out*
> *from other links performing a similar*
> *function in the saw chain, said feature*
> *provided such as to enable that link to be*
> *identified by a user regardless of wear to*
> *the saw chain* . . . .

(disputed term emphasized).

Defendants contend the disputed term means "[p]ermanent
coloration or shape of the identifying link causes the link to
visibly stand out regardless of dirt or wear on the chain."
Defendants note the '423 Patent's specification describes a link
for a saw chain that can be readily discerned by a feature that
does not wear off after use.  '423 Patent col.1 ll.31-39 (filed

22 - OPINION AND ORDER

Aug. 26, 1997). "In a preferred embodiment, the link is a tie strap that is coated with zinc finish that is noticeably different in appearance than the other links of the chain." '423 Patent col.1 ll.51-53. These portions of the specification, however, do not support Defendants' construction. The disputed term merely requires "an identifying feature that causes the link to visually stand out from other links" that will "enable that link to be identified by a user regardless of wear to the saw chain." This Claim 1 term does not make any reference to permanent shape or coloration. Moreover, the specification demonstrates neither permanent shape nor color is required by this portion of Claim 1. In addition to a preferred embodiment zinc-coated link, the specification provides "[o]ther finishes or even a modified link configuration will enable the user to identify the link." '423 Patent col.1 ll.54-58.

Plaintiffs contend the disputed term is clear on its face and, therefore, can be understood by its ordinary meaning. The Court agrees.

The Federal Circuit has held the task of construing claims is not always difficult:

> In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.

*Acumed*, 483 F.3d at 805 (quoting *Phillips*, 415 F.3d at 1312).
Here the ordinary meaning of the disputed term is apparent from
reading Claim 1.  Contrary to Defendants' assertions, there is
not any reason to conclude that the required "identifying
feature" referred to in Claim 1 must necessarily be either a
permanent color or a permanent shape.

Moreover, the dependent Claim 2 sets out that "one link is
provided with a wear resistant coating that provides that link
with a different appearance."  '423 Patent col.4 ll.21-23.  Even
if the meaning of Claim 1 were not readily apparent, Claim 2
clarifies a particular, permanent coloration of coating is not
required.  *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d
1361, 1369 (Fed. Cir. 2007)(under the doctrine of claim
differentiation, different words or phrases in different claims
presume different meanings or scope).

Claim 1 is clear on its face and relatively straightforward.
It merely requires

> an identifying feature that causes that link
> to visually stand out from other links
> performing a similar function in the saw
> chain, said feature provided such as to
> enable that link to be identified by a user
> regardless of wear to the saw chain

Accordingly, Court finds this term is understood by its
ordinary meaning alone.

## II.  Claim 4:  "replacing said specific link"

Claim 4 of the '423 Patent provides:

24 - OPINION AND ORDER

> selecting a specific link of a sequence of
> links to be formed into a loop of saw chain
> . . . [and] providing *a replacement link that*
> *is different in appearance from the*
> *appearance of the selected link* . . . .

(disputed term emphasized).

Defendants construe "a replacement link that is different in appearance from the appearance of the selected link" to mean "[p]ermanent coloration or shape of the replacement link differs from all remaining links in the chain performing the same function." Thus, in effect, Defendant proposes the same definition for this term as it did for the term in Claim 1 for almost identical reasons. Plaintiffs, however, contend the disputed language is clear on its face and, therefore, can be understood by its ordinary meaning. Again, the Court agrees.

The "replacement link" need only be "different in appearance" from the "selected link," and the specification and other claims make clear that the patentee contemplated more than mere color or shape as the means by which to differentiate the replacement link. Accordingly, the term "a replacement link that is different in appearance from the appearance of the selected link" does not require further construction and is understood by its ordinary meaning alone.

## CONCLUSION

For these reasons the Court construes the parties' disputed

25 - OPINION AND ORDER

terms in the '783 and the '423 Patents as set out in this Opinion and Order.

IT IS SO ORDERED.

DATED this 8th day of June, 2007.


                                    ___/s/ Anna J. Brown___
                                    ANNA J. BROWN
                                    United States District Judge